CHARLES J. WOLBERT, Jun., *v.* RICHARD C. HARRIS, WILLIAM D. HARRIS, JOHN W. HARRIS and BENJAMIN M. HARRIS.

The exclusion of one partner by the other from participation in the business of the partnership is a ground for injunction restraining the excluding partner from collecting debts due the partnership, and for the appointment of a Receiver.

As a general rule, the Court will not order the business of a partnership to be continued by the Receiver.

The bill, filed March 28th, 1849, states, that the complainant, on the 24th November, 1848, was preparing to go into business at McCartyville, in the township of Washington, in the county of Burlington; and for the purpose of effecting that object and prosecuting his contemplated business advantageously, did, on that day, enter into a written lease under seal, between Mahlon Hutchinson, of Philadelphia, the Burlington County Bank, at Medford, and Thomas Haven of Burlington, of the one part, and the complainant, of the other part, witnessing, that in consideration of $1, and of certain rents, covenants and agreements therein reserved and contained to be paid, kept and performed by the complainant, the said party of the first part leased to him and his assigns all that paper mill, grist mill, saw mill, mansion house, tenant houses and store house, with the land adjacent thereto, recently owned by the Wading River Canal and Manufacturing Company, situate at McCartyville aforesaid, to hold for two years from the 23d day of said November, 1848, payable yearly therefor $1,000, in quarterly payments, the complainant also paying all taxes not exceeding $40 yearly, and keeping the premises in as good repair as they were then in, except such repairs as might be rendered necessary by the breaking of the dam or water wheels or the blowing up or bursting of the machinery; taking from the premises sufficient wood and timber for the doing thereof; wear and tear and unavoidable accidents excepted; it being expressly

understood and agreed between the parties, that out of the first year's rent an amount not exceeding $500 might be appropriated by the complainant towards putting said mills in repair.

That on the 24th of November, 1848, the complainant took possession under the said lease, of the said premises, including also a large amount of personal property purchased of the proprietors, viz: store goods, wood, &c, on the premises, of about the value of $500, with the privilege of using and taking any such articles of furniture on the premises as might be needed, on terms hereafter to be agreed upon.

That he made arrangements with Mrs. McCarty to act as his housekeeper in the mansion house, at $1 50 per week. That he brought stoves and bedding and a variety of articles of furniture; fitted up a bed-room for his accommodation; had his washing and mending done there; and proceeded in all things after the manner of permanent residents. That his wife remained with her parents, in Philadelphia, until another room on the second story of the mansion house should be prepared, by putting up a stove, &c, for their better accommodation; expecting to move there before the then ensuing Christmas; and was alone prevented by the delay and disappointment of the desired repairs from making McCartyville her permanent residence, with the complainant, during the said term.

That Mrs. McCarty had immediately entered upon her appropriate duties; and the complainant proceeded with the general business operations of his engagement.

That on the 11th December, 1848, he entered into an agreement in writing, under seal, with Richard C. Harris, of Philadelphia, witnessing, that the said parties have formed a co-partnership for the manufacture of paper, carrying on grist mill, saw mill, keeping store &c. on the said premises, the said premises being *now* leased by the said Charles J. Wolbert, Jun., for the mutual benefit and purposes of this co-partnership, under the name and firm of Wolbert & Harris, upon the terms and conditions following, viz: The partnership shall commence on the day of the date thereof, and shall continue until November 24, 1850, and so long thereafter as the parties shall mutually agree; the net profits of the business of the firm shall be equally divided;

and the losses equally borne. Neither partner to withdraw from the firm in any one year more than $600 ; the balance of net profits to remain undivided during the partnership. Neither party to indorse any note or bill of exchange, nor use the name of the firm, except for the transaction of the regular business thereof; nor shall either, without consent, loan any money on his own responsibility ; and if either violates this article the other may forthwith annul the partnership and proceed to settle up the business thereof, and upon such settlement to pay over to such offending partner such sum as he may be entitled to. And if at the end of the lease the said Charles J. Wolbert, Jun., should be enabled to procure a new lease for the purpose of prosecuting the said business, it should be optional with the said Harris to continue ; or if said Harris should obtain a lease of the premises it should be optional with said Wolbert to continue or not. And in the event of one continuing the business and the other wishing to withdraw, he shall be paid a sum or equivalent to compensate him for the good will, fixtures &c, that may have accrued since the formation of the partnership ; and if the said equivalent cannot be mutually agreed upon it shall be determined by a third party mutually chosen. In case of difference of opinion in any matter relating to the business of the firm, the decision of a third party mutually chosen shall be conclusive. Subscribed, sealed and delivered, the said 11th December, 1848.

That, in pursuance of said agreement, the complainant and his said partner did thereupon proceed in the said business, upon the terms therein prescribed ; having opened an account current with Wm. D. Harris, a brother of his said partner, at his establishment in Philadelphia, for stock, and materials requisite for carrying on the business of the said firm ; the complainant continuing to reside at the said premises.

- The complainant avers that he, as one of the said partners, proceeded in the conduct of the business of the firm in scrupulous observance and fulfillment of the stipulations and covenants contained in the said agreement of partnership, without objection or complaint on the part of his said partner.

That, having occasion to visit Philadelphia on the business of the firm, raising funds for the hands, and to provide additional

machinery, he left the works on Sunday, the 4ih of February, 1849, and the next day met with his partner at the store of the said William D. Harris in Philadelphia, when arrangements were then made between them and the said Wm. D. Harris to raise funds for the use of the firm, upon their stock of manufactured paper in his hands; and it was then and there agreed, on the suggestion of the said Richard C. Harris, that he should go to the factory at McCartyville, and the complainant should remain in Philadelphia until the said Richard's return to said city in a few days. That during this time the complainant repeatedly called on Wm. D. Harris, who was receiving constant remittances of paper from the firm, to ascertain what amount of funds he was raising &c. That, instead of giving satisfaction, he seemed desirous of evading the complainant's inquiries; and did not give an account, or specify any amount whatever; and finally refused to comply with the complainant's inquiries, or to give him any information on the subject; assuming a mastery in the business, as appertaining to himself as proprietor rather than to the complainant. And the complainant then inquired whether he had heard from Richard, and whether he did not desire the complainant to return to the works; and received for answer that " he had received no letter from the complainant." Whereupon the complainant became alarmed and suspicious, and said " Well, I'll go back any how." That the complainant had not heard from his said partner during all that period, though he afterwards understood that he had been in Philadelphia several different times during this interval. That the complainant had been greatly afflicted, while in the city on that occasion, for eleven days, with inflammation of the throat. That on Wednesday, February 28, 1849, he returned to McCartyville, when, to his amazement and confusion, he discovered that a strange revolution had taken place at the establishment. The bill, after stating some minor matters, proceeds to state, that the complainant then sought after the books of the firm where they had been usually kept; that they were locked up, and all writing materials missing. That he then went to the paper mill to see Isaac Brown, who occupied a house he had promised to James Gibson, another hand. That he found another man at work whom he had previously discharged; and upon inquiry he soon ascertain-

the existence of a mutinous conspiracy on the premises. The tender of the machine, John Cole, and other persons whom the complainant had himself employed upon taking possession of the premises, refused to obey his orders. The clerk, Benjamin M. Harris, a brother of complainant's said partner, had possession of the keys, and, upon request of John W. Harris, refused to deliver them to the complainant. That they locked up the store, and John W. Harris refused the complainant admission or an inspection of the books of the firm; refusing the complainant access thereto. That the said John W. Harris, the father of the complainant's said partner, with great rudeness and clamor interrupted the progress of the complainant at the premises, denying his authority; asserting that the complainant had no right there, with menaces of personal violence rudely pushing him aside at the store door, it being then locked; and forbade the workmen to mind or submit to the orders and requests of the complainant.

That the complainant was wholly at a loss to account for this sudden and extraordinary change until, two days after, he observed in the North American and United States Gazette of Feb. 27, 1849, the following notice :

"Dissolution of co partnership. The firm of Wolbert & Harris is this day dissolved. All those having claims, and those indebted, will present them to me for settlement.

Feb. 27, 1849.                         R. C. HARRIS."

That the complainant was astonished at the said publication, it being without his knowledge or the slightest intimation made to him. That immediately thereupon, on the 3d of March, 1849, he caused the following to be published in the same Gazette :

"Notice. An advertisement of the dissolution of the firm of Wolbert & Harris appeared in this paper on the 28th ult. No such dissolution has taken place, as the subscriber has not withdrawn from the said firm, nor authorized the previous notice. Any business negotiated by or for the firm of W. & H. must be authorized by me.                         C. S. WOLBERT, Jr.,
                              Lessee of the Wading River Mills."

The complainant avers that he is informed and believes, that the said Richard C. Harris, his co-partner, hath combined and confederated, by corrupt and fraudulent agreement with his said brother, Wm. D. Harris, his said father, John M. Harris, and his said other brother, Benjamin W. Harris, neither of whom is reputed or believed to be responsible ; and that the said John and Benjamin do now assume to have exclusive charge and custody of the said mill property and estate and premises originally appertaining to this complainant, specified in his said lease, all of which accrued to the benefit of the said firm as aforesaid; and, acting as parties with or agents for the said Richard C. Harris and Wm. D. Harris, have and do forcibly exclude the complainant from any participation or influence in the conduct or management of the business of the said partnership, and from the use of the keys of the premises and accustomed entry into the store or inspection of the books of account of the firm.

The bill prays an injunction restraining Richard C. Harris, Wm. D. Harris, John W. and Benjamin M. Harris from receiving and collecting the debts due and to grow due to the partnership, or that may accrue out of the business transactions appertaining to the said premises since the 27th of Feb. 1849 ; and that a receiver be appointed ; and that proper directions may be given for the conduct and management of said business in future for the sole use and benefit of the complainant, until he shall be restored to his original, individual and separate estate and interest in the premises under his said lease; and that he be enabled, by the decree of this court, to resume the business in his own name and to his own use and benefit, and fulfill and perform the covenants contained in the said lease, freed from all connection with or responsibility to the said Richard C. Harris ; and that the said partnership may be dissolved ; and that the said Richard C. Harris come to an account with the complainant of the partnership dealings and transactions from the commencement thereof to the said 27th Feb. 1849 ; from which day the partnership should be held to be dissolved by his own act; and that the said Richard, William, John and Benjamin come to an account of the business transactions appertaining to the said premises from and after the said 27th Feb. 1849.

An injunction was allowed and a receiver appointed.

Richard C. Harris, William D. Harris and John W. Harris put in their joint and several answer.

They admit that the complainant and Richard C. Harris were in partnership, under the firm of Wolbert & Harris, and carried on the business of paper making and a store connected therewith; but the origin and formation of the partnership and all the asserted transactions connected therewith are untruly stated in the bill; the facts being distorted and misrepresented.

Richard C. Harris, answering for himself, says, that in March, 1848, the said Wolbert rented a paper mill in Delaware county, Pennsylvania; and it was proposed to this defendant, Richard C. Harris, to become a partner with him in carrying on said business. That he entered into articles of co-partnership with said Wolbert, dated March 27, 1848, as follows, (giving the articles.) This partnership was to continue until April 1, 1849, and thereafter, from year to year, so long as the parties thereto should mutually agree. Wolbert was to contribute ————, (the blank left for a sum is not filled up;) and Richard C. Harris a like sum. Neither was to withdraw from the firm in any one year more than $364. (In other respects the articles of partnership stated in the answer are the same as set out in the bill.)

That, soon after the commencement of business under this firm, difficulties arose between the complainant and the owner of the property; and there was not a sufficient supply of water.

Hearing, in the course of a few months, that the property at McCartyville was to be rented, and having consulted with his partner in relation thereto, it was agreed between this defendant and the complainant, that the complainant should go and view the premises, and if in his opinion it would answer, rent the same for the use of the firm. That the complainant went, and rented the said premises; and in a few days the complainant and this defendant went together to McCartyville; were together with Mrs. McCarty, and made the arrangement for her to keep house, and united in fitting up the dwelling house, in taking possession of the premises, and in every act done or proposed. He says it

is not true that the complainant purchased any goods, or brought any to McCartyville at the time he mentions.   That a quantity of goods, such as is mentioned in the bill, was purchased of the owners of the property ; and a draft drawn by the firm of Wolbert & Harris on Wm. D. Harris ; which draft was paid by said Wm. D. Harris.   The complainant may have put a small old stove or two in the house, which is all the goods he ever had there.

He says that he left the drawing of the lease from the owners to the firm of Wolbert & Harris to the complainant ; for he did not suppose he would practice a deliberate fraud on his partner ; and this defendant's surprise was great when he discovered that the lease had been taken in the name of the complainant ; but, as another lease could not be executed by all the parties without much trouble and inconvenience, and the complainant having finally agreed that a new article of partnership which should set forth that the lease was for the entire use and benefit of the firm, this defendant yielded to the measure.   (The sentence is so in the answer.)

He says that the partnership entered into on the 27th March, 1848, had not been dissolved ; but, considering that a new article of co-partnership was necessary, in consequence of a lease being drawn in his name, and a change of location, duration of time, and other slight alterations, such article was drawn and executed by the complainant and this defendant, and is, as this defendant believes, in substance the same set out in the bill, as by a duplicate &c. will more fully appear.

He insists that the allegation in the bill that the complainant entered into co-partnership with this defendant after he obtained the lease for the works and premises is erroneous, as he originally leased the said premises by parol, on or about Nov. 1, 1848, for the firm, but afterwards, in drawing the lease, fraudulently suppressed the name of this defendant and that of the firm.

And he says he is informed and believes, and therefore charges, that when asked by Mr. Haven, one of the lessors, why he took the lease in his own name when he had taken the property in the name of the firm, he replied that this defendant was only in partnership with him in the store ; which statement this

defendant charges to be false, as is proved by the said article of co-partnership above recited.

He says that, on or about Nov. 28, 1848, this defendant commenced operations at McCartyville, and pursued the business of the firm with fidelity and industry; so much so as seriously to affect his health; but soon the complainant began to show his true character. He was not in McCartyville one-third of his time. He was in Philadelphia, attending amusements; paid very little attention to the business of the firm. He undertook to keep the books of the firm, but did not do it; and what he did do few people can understand. He assumed the right to dictate, throughout all the works, in the most rude and boisterous manner. He endeavored to obtain credit for goods in Philadelphia, while idling his time away in that city; but no one would trust him without a guarantee of this defendant or his brother. He collected and took up money in the city where goods had been delivered by the order of Wm. D. Harris, to whom such goods had been charged; and, while thus wasting his time in the city, this defendant sent to his brother Wm. D. Harris 50 reams of paper, which were placed in his store in Philadelphia; and while said Wm. D. Harris was gone to dinner, the complainant, having ascertained that the goods were there, removed the same to an auction store, and obtained an advance upon it, and it was sold the next day and the money received by him. He appropriated money of the firm to his own private use whenever he could obtain it. He obtained estimates for large improvements of the property at McCartyville, of which the firm were mere tenants, with cupolas; and squandered the money of the Company in going to and from the city when there was not any business to be transacted, and the only course of business was to make what paper we could and send it to Wm. D. Harris, who would sell the same and advance us stock and money as we wanted it. The complainant proposed to open a store for the sale of our manufactured paper in New York, and threatened to do it in order to enlarge the credit, or rather the indebtedness of the firm.

He admits that the strange conduct of the complainant excited his suspicions, and induced this defendant to believe that the

complainant's object was to engross a large amount of property in the hands of the firm, by reason of the credit of this defendant, through his connections and friends, and take the chance of fortune for the payment.

And this defendant is informed and believes, and therefore charges, that the complainant, when inquired of by this defendant's father as to the prospect of profits, said that he was determined to run the firm to the utmost of its credit, and take care of Wm. D. Harris and Mr. Fisher, and let the other creditors whistle for their money.

That this defendant found that the complainant had no means; that he had failed in business before; that notes were given by him for his old debts; and that the firm of Wolbert & Harris was liable to be broken up and its credit ruined by suits against him and levys upon his interest in the firm. That this defendant was obliged to settle a claim against him on account of his old debts, to prevent judgment and execution, by paying the costs.

That from his labor and exertions at the works he brought on an attack of disease which required medical attendance, and he left McCartyville for Philadelphia, leaving the complainant in charge of the works; and in a few days the complainant left McCartyville also and came to Philadelphia, leaving all the works in the care of the workmen, without any superintendence, orders or instructions. But the complainant did not call on this defendant, nor was there any proposition to raise funds, nor did he come for any such purpose, as none could be raised until the stock on hand could be worked up and remitted to Philadelphia.

Under these circumstances, and finding it impossible to continue the business of the firm any longer, as he could not obtain any further advances, and that the firm was indebted to his brother in $2,636 54, and was insolvent, without any prospect of being able to make payment, he caused a full and fair inventory of all the stock and personal property belonging to the firm to be made at McCartyville, at the cost of said property, and, on the 22d Feb. 1849, sold and transferred the said personal property to the said Wm. D. Harris.

He says he has not received any money from said firm, except

about $60, for his own personal use, from the formation of the partnership, in March, 1848 ; that he made this transfer as the only means of paying the debts of the firm of Wolbert & Harris, as every article contained in the said inventory, all the goods and chattels of every description at the works having been supplied by the said Wm. D. Harris, or the payment thereof guaranteed by him.

That upon such transfer the amount of the said inventory, being $1,103 21, was credited to Wolbert & Harris, leaving a large balance due said Wm. D. Harris ; and the said John W. Harris, the father of said Wm. D. Harris, was appointed the agent of the said Wm. D. Harris to take charge of the said works at McCartyville.

And this defendant, considering that Wolbert had violated the said articles of co-partnership in every essential part, admits that on the 27th of Feb. 1849, he published a notice of the dissolution of the co-partnership as set forth in the bill ; as he submits he had a right to do.

He says that in the forming of the partnership, in March, 1848, the arrangement was made with Wm. D. Harris, who was and is largely dealing in the business of paper and the stock and materials for making paper, that he should furnish the stock and funds for establishing and carrying on the manufacture of paper ; and that all paper made by the firm should be sent to him in Philadelphia ; and that he should be allowed 5 per cent. commissions on all the paper manufactured, for his advances and agency ; and that this agency continued up to the day of assignment and transfer of the property, on the 22d Feb. 1849.

He denies that there was any arrangement made between the said firm and Wm. D. Harris to raise funds for said firm ; the said William having refused to furnish any more funds until he should be paid for what he had already advanced or a portion thereof.

He admits that he saw the complainant at the store of his brother, in Philadelphia, about the time mentioned in the bill ; he had but little conversation with him. He denies that there was any arrangement with the complainant that this defendant should go to the factory in McCartyville and that complainant

should remain in Philadelphia. He went to McCartyville of his own accord, as an act of duty, to look after the interests of the firm ; which interests he had deserted.

He denies that there was any combination or agreement to injure the complainant, or any such intention or motive. His brother William being a large creditor, and having guaranteed all other debts except a small balance to the workmen, whom he is willing to pay, as the firm had no credit, and now fully understanding the character of the complainant, he proposed to transfer the property of the firm to his said brother William, who agreed to carry on the works, and, if any profits should be made, to carry such profits to the credit of said Wolbert & Harris, in liquidation of their debt.

He says his father has no interest in the business. That his brother Benjamin is under 21, and was fixed upon as the clerk of the firm, and had no interest in the concern except his stipulated salary.

He says he is ready to come to an account with the complainant of the partnership transactions from the commencement of the partnership business to the dissolution thereof. And he agrees that the partnership is or ought to be dissolved and the property restored to the said Wm. D. Harris, as the only means of paying said debts ; and he prays that the court will so order and decree.

And Wm. D. Harris, answering for himself, says, that in March, 1848, being in the paper business, and having on hand a large stock of goods for the manufacture of paper, it was proposed to employ Wolbert, who was out of business and had formed some acquaintance with this defendant, in a paper mill ; and, in pursuance of such proposition, Wolbert, on or about March 22, 1848, rented a paper mill in Delaware county, Pennsylvania ; and between that day and the 27th of the same month, it was arranged that Richard C. Harris should form a partnership with Wolbert in that business. This defendant then supposed that Wolbert had some means ; and in drawing the article of partnership the 2d article stipulated that he should contribute, as his share of the capital stock, the sum of ———, and that Richard

C. Harris should contribute a like sum. But when the article was about to be completed Wolbert said he had no money or means, and that the co-partnership must fall through unless this defendant advanced the capital ; and as the mill had been rented, and this defendant was anxious to aid Wolbert, and believing he had honesty, industry and integrity, in all which he has been disappointed, he agreed to advance the capital necessary to commence and continue operations, upon condition that all the paper made should be sent to his store in Philadelphia, and that he should have 5 per cent. commissions on the paper made and sold, for his agency and advances, that being the usual allowance ; which advances he made, and the firm commenced business at said mill in Pennsylvania ; every dollar of the capital being advanced by him. He also aided in procuring hands and workmen.

In a short time it was found that the mill in Pennsylvania did not answer, there not being sufficient water. And this defendant being in New Jersey after workmen he learned that the McCartyville works were to let, and recommended to Wolbert & Harris to see the works, and if they would answer to take them and give up the works in Pennsylvania. They did so ; and under the same agreement this defendant furnished the capital to carry on the business at McCartyville. He furnished the money to pay the expenses of going down to view the premises. The said firm of Wolbert & Harris had no credit ; and the defendant guaranteed the payment of store goods and such articles as were wanted and he had not on hand or did not deal in.

The said firm commenced operations about Nov. 29, 1848, at McCartyville ; and it was soon perceived that the complainant did not attend to the business of the firm. He was often seen in Philadelphia taking his pleasures, and constantly soliciting money from this def't ; and though this def't believes that his brother Richard worked hard and did all in his power in the business, yet the remittances of paper came in slowly and in small parcels. In the meantime Wolbert was in the city endeavoring to lay his hands on every dollar he could obtain, which disappeared so soon as as he received it. And, upon a load of 50 reams of paper coming from McCartyville and being placed in this defend-

39

ant's warehouse, Wolbert induced this defendant's porter, while this defendant was gone to dinner, to allow him to take said 50 reams of paper, and Wolbert took it to an auction store, received an advance upon it, and it was sold at auction the next day, and Wolbert received the proceeds of the sale thereof. And, in order that he might appear comfortable to return to McCartyville, this defendant was obliged to give an order upon his shoemaker and upon his tailor, rather than trust Wolbert with money. Hearing, about this time, of many acts and doings of Wolbert, and fearing that things were not going on right, this defendant requested his father, John W. Harris, to go and see how matters stood at McCartyville. He found things in a bad state; and upon his representing to Wolbert the impossibility of continuing under such circumstances without utter ruin, Wolbert stated that he intended to get all the property into his hands, or the hands of the firm, that he could by credit; and said, "we (the firm) will take care of your son (this defendant) and Fisher and you, and the rest may whistle for their demands. If they will only hide, I will steal." And on his journey from McCartyville to Philadelphia, on the 14th January, 1849, Wolbert detailed to the said J. W. Harris, as this defendant is informed by said Harris, that he, Wolbert, had arranged the prize fight between Rusk and Freeman, some two or three years ago, which resulted in the death Freeman; and boasted that he got up the fight and held the stakes until two or three days before the fight. The conduct of Wolbert so shocked and alarmed this defendant that he resolved to have as little intercourse as possible with him; and on or about the 22d Feb. 1849, the said firm was indebted to this defendant in $2,636 54; and upon inquiry of his brother this defendant found the whole amount and inventory of property at McCartyville amounted to $1,103 31; and that the goods and other property was being wasted, and in a short time would all be exhausted, and no means left to pay this defendant or any other person.

Under these circumstances this defendant agreed with his brother Richard to purchase the said goods, chattels and property of the said firm, and did purchase the same, at the cost prices set down in the inventory, amounting in the whole to

$1,103 31, and gave credit to the said firm in liquidation of their indebtedness to this defendant; and after giving every credit the said firm owed this defendant on that day $634 04.

This defendant agreed with the said firm, through the said Richard, that he would run the said works, and if any profits should be realized the same should be credited to the said firm in payment of their indebtedness to him. This defendant requested his father, J. W. Harris, to take possession of the property, and and authorized him to continue B. W. Harris as clerk in the store.

He denies that he was actuated by any fraudulent motives, or was guilty of any impure or fraudulent conduct. That he believed then, and does now, that it was the only way of saving the property from the reckless and fraudulent conduct of Wolbert; every dollar of which had been furnished by this defendant. He admits that Wolbert did occasionally hang about the store, and may have asked the question stated in the bill; but this defendant had other business to attend to, and may have felt too much repugnance to attend to him.

He insists that he had a right to purchase the said property of the said Richard C. Harris, as the partner; that it is his lawful property and ought to be restored to him. That the stopping of the said works is a great injury to him in his business, and to the laborers and workmen and their families dependent on this defendant, who are thereby thrown out of employment.

That this defendant also has contracts for the delivery of paper, with his customers, whereby he will sustain great loss and injury; and he offers to give the most ample and satisfactory security, to be fixed by this court, to answer any damages or any decree which may be made in this cause. And he prays that, upon giving such security, the injunction issued in this cause may be dissolved, and the proceedings appointing a receiver be set aside.

John W. Harris, answering for himself, says, that being authorized by his son William D., he took charge of the mills and property at McCartyville, after the same was sold and conveyed to the said William D. by Richard C. Harris, partner of Wolbert, and carried on the business for the said Wm. D. Harris

and in his name. The business went on much better than before. The hands were entirely satisfied, and we made a considerable quantity of paper, which was sent to Wm. D. Harris in Philadelphia.

On the 28th February, 1849, Wolbert arrived at McCartyville, came into the store and went behind the counter. After remaining a short time he went out, and the store door was locked. He went into the mill; and soon came to this defendant and demanded some keys. This defendant replied that he could not give him the keys, as the property now belonged to William D. Harris, whose agent this defendant was. This defendant was standing at the store door. The complainant demanded the key of the store door and it was refused him. He got into the store through the window, breaking the sash and glass; went directly to the money drawer, broke the lock of the drawer and took out the money, about        dollars, and returned with it through the window. As this defendant demanded the bag of him, he struck this defendant a severe blow on the hand, and said " take that ;" and shortly after went to the stable, broke the lock and took out a horse belonging to the premises which was transferred with the other property to the said Wm. D. Harris, and made his escape to Philadelphia. The horse has not been returned ; and this defendant has reason to believe that Wolbert has sold him and put the money in his pocket.

He says he has no interest in the controversy ; and denies that he entered into any fraudulent combination with his sons mentioned in the bill of complaint, or with any other persons, to injure the complainant and turn him out of the property. He requested the hands to treat Wolbert with civility, but not to obey his orders.

On this answer a motion was made to dissolve the injunction, and vacate the order appointing a receiver.

*W. N. Jeffers* in support of the motion. He cited 3 *Kent's Com.* 40, 41, 45, note A., 46, 53, 4, 60 ; 3 *John. Rep.* 68 *Paige,* 30 ; 1 *Montag. on Partn.* 22, note, 23 ; 5 *Cranch.* 289, 300 ; 7 *East.* 211, 213 ; 12 *Mass. Rep.* 54 ; 11 *Ib.* 476, 481.

*S. R. Hamilton* and *W. Halsted* contra. They cited *Story on Partn.*, pages 156, 7, 8, 9, 461; 4 *Wash. C. C. Rep.* 232; 5 *Paige*, 40, 1; 5 *Barn. & Ald.* 405.

THE CHANCELLOR. On the bill and answer there can be little doubt that the partnership will be dissolved. Both parties ask a dissolution; and the circumstances seem to require it.

The injunction, so far as it restrains the defendants from receiving and collecting the debts due or to grow due to the partnership, was proper; and the appointment of a receiver for the purpose of collecting such debts and taking charge of any remaining property of the firm which he could get possession of was proper. The bill charges, and the answer admits, that the complainant was excluded from the premises. This is a prominent ground for such injunction and the appointment of a receiver. 1 *Swanst.* 481; 1 *Turn.* and *Russ* 496. I do not see that either branch of the motion can prevail.

What the receiver should do in this case under the charges in the bill and the statements in the answer is another question. The bill and the prayer of it extends to the restraining the defendants from receiving and collecting the debts that may accrue out of the business transactions appertaining to the premises since the 22d of February, 1849, the day on which the alleged sale and transfer of the partnership property by Richard C. Harris to William D. Harris was made; and that proper directions may be given to the receiver for the conduct and management of the business in future, for the sole use and benefit of the complainant, until he shall be restored to his original, individual and separate estate and interest in the premises under the lease mentioned in the bill, and he be enabled by the decree of this court to resume the business in his own name and to his own use and benefit.

Whether the complainant is right in his claim that the lease was made to him individually and must be so considered in this court is a question to be settled, not on this motion, which is a motion by the defendants to dissolve the injunction and vacate the order appointing a receiver, but on the final hearing. And

this question has not been affected by the order for injunction and receiver.

There is no application now before the court for directions to the receiver to proceed in the conduct and management of the business to the end contemplated by the complainant in his bill. The court, therefore, could not now act in reference to the right claimed by the complainant that the lease is his individually. And, again, if the lease belongs to him individually, and he has been excluded from the premises, he has an immediate remedy at law.

If, as claimed by the answer, the lease is to be considered as made to the partnership, it is not probable that an application by the complainant for instructions to the receiver to proceed with the business until the determination of the cause would be successful. The object of the court in appointing a receiver on a bill for the dissolution of a partnership is the care of the partnership property until the cause shall be decided, not the conducting of the business of the partnership. It is the court itself, that, by its officer, the receiver, has the care of the partnership property, and that, not in behalf of the complainant or defendant only, but of all the parties. As a general rule, the court will not order the business to be continued by the receiver.

In either view of this question as to the lease, no action of the court as to the possession of this mill &c. can now be had; for the reasons before given. And, further, this court could not properly change the possession—turn a third party out and put its officer the receiver into possession, as between the partnership and a person claiming the lease adversely to the partnership. On the other hand, if the lease shall be considered as made to the partnership, the course of the receiver will be to sell the lease, as well as the other property of the partnership of which he can obtain possession.

As to the argument for dissolving the injunction derived from the fact or allegation that the party now in possession is conducting business for himself and on his own means, I do not see that the general order made for an injunction pursuant to the prayer of this bill restrains him from so doing. True, the bill prays that the defendants may be restrained from receiving and col-

lecting the debts due or to grow due to the partnership, *or that may accrue out of the business transactions appertaining to the said premises since the 22d of February*, 1849 ; but this last clause must relate to what might be considered business transactions of the *partnership*, before dissolution decreed. It cannot relate to the business transactions of a third person, William D. Harris, in possession of the premises and doing business there on his own means.

If the injunction issued is broader than the prayer of this bill, or the defendant Wm. D. Harris is apprehensive that the language of the prayer of the bill restrains him from proceeding to carry on the works on his own means while holding possession of the premises, the injunction will be modified. This court cannot now turn him out and put the complainant in. He keeps possession at his peril; and while in does what he pleases, also at his peril. If the lease belongs to the complainant individually, he must resort to his legal remedy to recover possession of the premises.

The matters of difficulty, as things now stand, might be presented to the court, by either party, on an application for directions to the receiver.

The only question now before the court is, whether the injunction shall be dissolved and the order appointing a receiver vacated. I see no ground on which the motion can succeed. It may be observed here, in addition, that, even if the lease be considered as made to the partnership, and if the alleged sale and transfer of all the other property of the partnership by Richard C. Harris to Wm. D. Harris can be supported, yet, as the lease was not assigned, (it is not stated in the answer that the lease was sold and assigned by Richard C. Harris to Wm. D. Harris,) it does not appear by what right the complainant could be excluded from the premises.

Motion denied.

Subsequently, a petition was presented to the court by Wm. D. Harris, stating, that after he purchased the interest and property of Wolbert & Harris as mentioned in the pleadings, he sent

to the factory at McCartyville several articles of machinery, store goods, and materials for the manufacture of paper, of the value of $859, which was and is his exclusive property. That he is informed and believes that the receiver appraised the said machinery, store goods and materials so sent to McCartyville after such purchase on the 22d of February, 1849, and also about $350 worth of paper made by the petitioner at his individual expense; and the said receiver retains the possession thereof.

That the petitioner is informed and believes that the store has been opened since the injunction was served and robbed of a portion of the property of the petitioner; and that he has just cause to fear that his property at McCartyville will be entirely wasted, destroyed or sacrificed. That he has paid debts of the firm of Wolbert & Harris of more than $200 since the 22d Feb. 1849, in pursuance of the agreement with said Richard C. Harris; and there are no debts due to the firm of Wolbert & Harris.

He therefore prays that directions may be given to the receiver to deliver to him such machinery, goods and materials as he sent to McCartyville while the works were in his possession, after the 22d February aforesaid. That the receiver may be directed to deliver to him all the property he purchased of Richard C. Harris, the partner of Charles J. Wolbert, on the 22d Feb. 1849, upon his giving security to answer the appraised value thereof if this court shall decree that the sale to him by Richard C. Harris is not a valid sale. And that the receiver may be directed to permit him to carry on the business of making paper at the works at McCartyvile on such terms and conditions as may be fixed and ordered by the court.

An application was also made on the part of Wolbert for instructions to the receiver; Wolbert claiming that, if either partner is to be permitted to carry on the business, he is the one entitled to do so.

*T. W. Mulford* for Wm. D. Harris.

*W. Halsted* for Wolbert.

THE CHANCELLOR directed the receiver to deliver the store goods to Wm. D. Harris on his giving security to account for them if the result of the suit required; and that the receiver deliver to him any goods belonging to him individually. But declined giving directions to the receiver to continue the works at the mill or to permit either party to do so ; and directed the receiver to sell the lease, and close the business ; and that the accounts be stated.